**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

| | |
|---|---|
| HANNON ARMSTRONG SUSTAINABLE INFRASTRUCTURE CAPITAL, INC., <br> One Park Place, Suite 200 <br> Annapolis, MD 21401 <br> Anne Arundel County <br><br> *Plaintiff*, <br><br> v. <br><br> CARBON COUNT PTY LTD., <br> 98 Maribyrnong Street <br> Footscray, Victoria 3011, Australia <br><br> *Defendant*. | CIVIL ACTION NO. 1:22-CV-02839 <br><br><br> JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiff Hannon Armstrong Sustainable Infrastructure Capital, Inc. ("Hannon"), through its undersigned attorneys, brings this Complaint against Defendant Carbon Count Pty Ltd. ("Defendant") and alleges as follows:

1.      Tracing its roots back to the 1980s, Hannon is a well-known, well-respected U.S.-based business that is known for its mission to promote environmental sustainability as well as climate restoration by guiding investments in strategic projects.

2.      Hannon effects its mission in part through the goods and services it offers under its well-known, unique CARBONCOUNT brand that Hannon has worked over the past seven (7) years to build.

3.      Thanks to Hannon's time and energy, both Hannon's environment-positive mission and its CARBONCOUNT brand have garnered significant attention and are highly regarded in the United States.

4. The CARBONCOUNT Mark has likewise become well-known as a source identifier of Hannon and its high quality goods and services.

5. The CARBONCOUNT Mark therefore embodies substantial goodwill.

6. That goodwill, along with the CARBONCOUNT Mark, belongs exclusively to Hannon in the United States.

7. Defendant is an Australian company that has recently undertaken efforts to expand its business to the United States, using CARBONCOUNT as both its business name as well as its primary mark.

8. Defendant has engaged in this activity despite Hannon's well-established, senior rights in CARBONCOUNT.

9. Defendant has engaged in this activity with full knowledge of, and therefore flagrant disregard for, Hannon's superior rights.

10. Hannon therefore brings this action for trademark infringement, unfair competition, and false designation of origin under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Maryland common law.

## PARTIES

11. Plaintiff Hannon Armstrong Sustainable Infrastructure Capital, Inc. is an entity formed under the laws of the State of Maryland with its principal place of business at One Park Place, Suite 200, Annapolis, Maryland 21401.

12. Defendant Carbon Count Pty Ltd. is an entity formed under the laws of Australia with a principal place of business at 98 Maribyrnong Street, Footscray, Victoria 3011, Australia. On information and belief, Defendant Carbon Count Pty Ltd. may be served through its U.S. counsel (Neal, Gerber & Eisenberg LLP c/o Andrea S. Fuelleman, 2 North Lasalle Street, Suite

- 2 -

1700, Chicago, Illinois 60602) or through its director and secretary, Philip Mulvey, in Australia at the company's registered address (98 Maribyrnong Street, Footscray, Victoria 3011).

## JURISDICTION AND VENUE

13.     This is a civil action for trademark infringement under the Lanham Act and for unfair competition and false designation of origin under both the Lanham Act and Maryland common law.

14.     This Court has subject matter jurisdiction over this lawsuit under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over Hannon's common law claim under 28 U.S.C. § 1367(a).

15.     This Court has jurisdiction over Defendant under at least Federal Rule of Civil Procedure 4(k)(2) based on Defendant's aggregate contacts with the United States as a whole, which to the extent known are discussed more completely below.

16.     Venue is proper in this judicial district under at least 28 U.S.C. § 1391(b)(2) and (c)(3).

## FACTUAL BACKGROUND

**A.      Plaintiff Hannon Armstrong and its CARBONCOUNT Mark**

17.     As briefly noted above, originally founded in 1981, Hannon has been—and currently is—a recognized leader in financing projects across industries in the United States, including but not limited to projects dedicated to the promotion of sustainable, climate-positive solutions that both avoid and reduce impacts on the environment and climate change.

18.     For example, ahead of its time, Hannon completed its first renewable energy transaction in 1987, refinancing the Solar Energy Generating Systems III plant, a 30-megawatt solar plant located in California.

19.     That same year, Hannon pioneered the use of third-party capital for government energy efficiency projects with a 25-megawatt cogeneration plant at a facility operated by the U.S. Department of Energy.

20.     Throughout the 1990s and early 2000s, Hannon continued its focus on sustainability, financing, among other things, a $1 million contract for lighting upgrades for the U.S. Postal Service and over $700 million for clean energy assets throughout North America.

21.     Approximately a decade later, Hannon doubled-down on its commitment to environmental protection, taking the company public in 2013 as Hannon Armstrong Sustainable Infrastructure Capital and further focusing the company nearly exclusively on climate-positive project investments.

22.     With concerns related to carbon-based climate change rapidly escalating during that period, Hannon also devoted a significant part of its growing business toward not just measuring but also quantifying the impact of carbon emission reduction efforts across industries in the United States in order to promote transparency into those increasingly important efforts and claims.

23.     For example, after investing significant time and research, Hannon developed a unique scoring tool that, among other things, allows Hannon to assess carbon reduction efforts by both measuring the emission actually reduced by those efforts as well as quantifying the benefit created by that numerical reduction or emission avoidance based on factors such as, among other things, geographic location.

24.     Recognizing the public good that its methodology could create, Hannon began using its proprietary scoring tool to offer to consumers not just a uniform metric through which they could evaluate how dollars spent on a certain project would translate into climate-change mitigation, but also analysis and advice on the same.

25.     At the same time Hannon focused its business on sustainability and climate-change prevention and reversal efforts, Hannon's marketing and branding strategies shifted to reflect the same goals and principles.

26.     For example, Hannon began offering a variety of services under the brand SUSTAINABLE YIELD at least as early as 2013.

27.     At least as early as 2015, Hannon—in tandem with the non-profit Alliance to Save Energy—also began promoting and offering a variety of services to consumers in the United States in connection with the unique brand CARBONCOUNT, including but not limited to by branding services Hannon offers related to its proprietary scoring tool CARBONCOUNT.

28.     Based on those efforts, Hannon and Alliance to Save Energy created substantial recognition of, and goodwill in, the CARBONCOUNT Mark, both within their industry and among the general public as well.

29.     For example, in 2015, Hannon received the Finance for Resilience prize for its CARBONCOUNT branded services from Bloomberg New Energy Finance. In tandem with that prize, Bloomberg New Energy Finance noted that CARBONCOUNT "will grow the market for green bonds by providing a consistent, quantitative measure of avoided carbon emissions per dollar of investment."

30.     Hannon's CARBONCOUNT branded services more than met those expectations, and in 2019, the American Council on Renewable Energy recognized the value of Hannon's CARBONCOUNT services, reflecting in a white paper that CARBONCOUNT "promotes transparency in low-carbon project finance by creating comparable metrics for renewable energy and energy efficiency projects" while also "incorporate[ing] the forward-looking emissions and power generation forecasts used by credit rating agencies."

31.     To better protect their investments in—and the value of—the CARBONCOUNT Mark, Alliance to Save Energy applied to register the CARBONCOUNT Mark with the United States Patent and Trademark Office ("USPTO") on the Supplemental Register in connection with "assisting others in evaluating bond investments in energy efficiency and renewable energy projects" on March 30, 2015.

32.     The USPTO subsequently issued a certificate of registration for the CARBONCOUNT Mark, U.S. Reg. No. 5,056,398, on October 4, 2016. That registration remains valid and in full force as of the filing of this Complaint. A true and correct copy of the certificate of registration and the TESS/TSDR information is attached hereto as **Exhibit 1**.

33.     After continuing to work together to promote and build the CARBONCOUNT Mark, Alliance to Save Energy agreed in March 2019 to assign the CARBONCOUNT Mark and USPTO registration, along with all goodwill, to Hannon. A true and correct copy of the assignment (which is also publicly available from the USPTO's online Trademark Status & Document Retrieval database) is attached as **Exhibit 2**.

34.     Since 2019, Hannon has expended approximately $1 million in marketing and promotional efforts to continue to build upon the already existing consumer recognition of, and goodwill in, its CARBONCOUNT Mark.

35.     For example, Hannon promotes the CARBONCOUNT Mark through, among other things, national advertising campaigns and its Climate Positive Podcast.

36.     Hannon likewise prominently features its CARBONCOUNT Mark on Hannon's website, where Hannon advertises, promotes, and offers for sale its services throughout the United States. Those same webpages also explain the benefits that Hannon's CARBONCOUNT scoring tool and related services provide to investors and why the CARBONCOUNT brand permeates

through the services Hannon provides. A true and correct copy of Hannon's current website showing these uses of the CARBONCOUNT Mark is attached as Exhibit 3, and a compilation of examples of such uses are shown immediately below:



37.     Hannon also prominently features its CARBONCOUNT Mark in its Annual Reports and Sustainability Report Cards, which are used for, among other things, promotional disclosures in quarterly earnings calls, in quarterly and annual financial reports mandated by the U.S. Securities and Exchange Commission, and in Hannon's quarterly press releases and its annual Impact Report. Examples of this usage are attached as **Exhibit 4** and pictured immediately below:







## Energy Management-as-a-Service

# $6 million

**5.93 CarbonCount®**

Investment in a smart building technology leader's award-winning Energy Management-as-a-Service (EMaaS) platform which offers a more accessible behind-the-meter energy efficiency solution for small to mid-sized buildings. The EMaaS approach combines installation, equipment, software, and service costs into a bundled monthly payment that is designed to be significantly lower than the energy savings the solution provides.

### HANNON ARMSTRONG
### Sustainability Report Card 2019

| MARKET | REGION | CARBONCOUNT® | MARKET | REGION | CARBONCOUNT® |
|--------|--------|--------------|--------|--------|--------------|
| BTM | National | 6.15 | BTM | West | 0.29 |
| BTM | National | 5.12 | BTM | West | 0.27 |
| BTM | Northeast | 1.49 | BTM | West | 0.27 |
| BTM | West | 0.95 | BTM | West | 0.25 |
| GC | West | 0.78 | BTM | Asia Pacific | 0.25 |
| GC | South | 0.59 | BTM | West | 0.24 |
| GC | South | 0.59 | BTM | West | 0.24 |

### HANNON ARMSTRONG | SUSTAINABILITY REPORT CARD 2020

| MARKET | REGION | CARBONCOUNT® | MARKET | REGION | CARBONCOUNT® |
|--------|--------|--------------|--------|--------|--------------|
| BTM | National | 2.89 | BTM | Midwest | 0.28 |
| BTM | National | 2.87 | BTM | West | 0.28 |
| BTM | National | 2.86 | BTM | West | 0.24 |
| BTM | National | 2.85 | BTM | South | 0.24 |
| BTM | National | 2.85 | BTM | West | 0.23 |
| BTM | National | 2.84 | BTM | National | 0.20 |
| GC | National | 2.02 | BTM | National | 0.18 |

38.     Hannon also uses the CARBONCOUNT Mark on its "CarbonCount Green Commercial Paper Note Program." Hannon uses the program to evaluate and acquire or refinance green projects. Reflecting the value that Hannon sees in its CARBONCOUNT calculations, Hannon features the CARBONCOUNT Mark repeatedly in its press releases to demonstrate the

benefits of Hannon's services and Hannon's commitment to green investment projects. Examples of these press releases are attached as **Exhibit 5**.

**B.      Hannon's CARBONCOUNT Mark is Well-Recognized and has Secondary Meaning**

39.      Thanks to Hannon's tireless efforts to build and promote its CARBONCOUNT Mark (including but not limited to those described above), the mark is well-recognized by consumers as a unique source identifier of Hannon's proprietary, uniform metric for assessing climate impact resulting from carbon reduction and the services Hannon provides to customers in connection with that metric.

40.      For example, by 2019, just four short years after Hannon and Alliance to Save Energy began using the CARBONCOUNT Mark, Hannon's provision of services to consumers in the United States had already raised approximately $644 million of "CARBONCOUNT-based debt," i.e., funds invested into projects based on Hannon's CARBONCOUNT branded metric and investment services.

41.      By 2020, that number had grown to approximately $1.4 billion, and by 2021 it had grown to approximately $2.3 billion.

42.      Currently, Hannon is projecting that it will raise nearly $1.3 billion in CARBONCOUNT-based debt in 2022.

43.      Hannon's hard work and substantial investment promoting its CARBONCOUNT Mark has also resulted in unpaid media coverage of the brand and Hannon's goods and services offered in connection with it.

44.      By way of example only, Hannon and its CARBONCOUNT Mark were featured:

a.      in May 2020 by 3BL Media, which published an article on Hannon's investments toward a climate-positive future, noting that environmental

impact is embedded in Hannon's DNA through its CARBONCOUNT brand, *see* **Exhibit 6**;

b.  in September 2020 by Business Wire (and republished by the Associated Press) in an article discussing Hannon's commitment to climate-positive investments and reducing carbon emissions and stating, among other things, that Hannon "has long been recognized as a leader among U.S. companies in terms of GHG reductions and transparent disclosures" and highlighting Hannon's CARBONCOUNT Mark as one of Hannon's keys to success, *see* **Exhibit 7**;

c.  in November 2020 by Nomura's Heroes Magazine, which featured Hannon's chairman and chief executive officer, Jeff Eckel, on the cover after naming him of Nomura Greentech's Sustainable Heroes and including an interview of Mr. Eckel about Hannon's pioneering CARBONCOUNT branded metric, *see* **Exhibit 8**; and

d.  in December 2020 by Greentech Media, which published an article announcing that Hannon and Clearway Link would jointly invest about $950 million in a portfolio of new and existing wind, solar, and energy storage projects while specifically discussing Hannon's CARBONCOUNT Mark and its use of its CARBONCOUNT branded metric to guide the investment strategies Hannon provides to consumers, *see* **Exhibit 9**.

45.    This widespread unpaid media coverage continued into 2021, including but not limited to in coverage by:

a.     NYU's Stern Center for Sustainable Business, which published a whitepaper titled "Financing Mechanisms to Support Sustainable Business Practices," and among other things, recognized Hannon for its successes in financing renewable energy and energy efficiency projects and highlighted Hannon's CARBONCOUNT Mark, *see* **Exhibit 10**;

b.     Energy Capital Media, which published an article highlighting Hannon's first Green Commercial Paper Program, which raised $100 million to support eligible green projects, and specifically discussed Hannon's CARBONCOUNT Mark, *see* **Exhibit 11**; and

c.     Renewable Energy Magazine, which highlighted Hannon's plan to further develop and promote its CARBONCOUNT Mark through a partnership with REsurety and use of REsurety's Location Marginal Emissions tool, *see* **Exhibit 12**.

46.    As discussed above, Hannon has made substantial investment in, generated significant funds through, and engaged in widespread and continuous use and promotion of the CARBONCOUNT Mark (among other things). This, together with the public attention Hannon's CARBONCOUNT Mark has enjoyed in not just 2020 and 2021 but years prior establish that Hannon's CARBONCOUNT Mark has acquired secondary meaning, and that it had already acquired secondary meaning before Defendant began using its CARBONCOUNT mark (discussed below) in the United States.

47.    In other words, the CARBONCOUNT Mark has become, and continues to be, known by consumers in the United States as a source identifier of Hannon and its high-quality services.

48.    To increase protection for its valuable brand, Hannon filed an application in 2021 with the USPTO to register its CARBONCOUNT Mark on the Principal Register, U.S. Appl. Ser. No. 97/178,245. A true and correct copy of the USPTO TESS/TSDR for this application is attached as **Exhibit 13**.

49.    Hannon's federally-registered CARBONCOUNT Mark (U.S. Reg. No. 5,065,398), its CARBONCOUNT trademark application (U.S. Appl. No. 97/178,245), and the CARBONCOUNT name and brand are collectively referred to in this Complaint as the "CARBONCOUNT Mark."

**C.    Hannon's Plans for the CARBONCOUNT Mark**

50.    In addition to the current goods and services Hannon promotes, sells, offers to sell, and markets in connection with the CARBONCOUNT Mark, Hannon currently has, and is continuing to make, business plans to increase the scope of its goods and services.

51.    For example, Hannon has chosen CARBONCOUNT to be the subject of a company-wide Key Strategic Initiative for 2022, updating its CARBONCOUNT branded metric with more granular data to produce an even more accurate figure regarding the amount of emissions Hannon estimates an investment project will avoid now and over the course of its lifetime.

52.    Hannon has also assembled a coalition of partner entities to further expand its CARBONCOUNT-branded services as an investment decision making tool across a range of asset classes and has been working with buyers of clean energy to tag renewable energy credits ("RECs") purchased.

**D.    Defendant Carbon Count Pty Ltd.**

53.    Defendant Carbon Count Pty Ltd. is an Australian company that, on information and belief, was founded in 2019.

54.     As recognized on its website (https://www.carboncount.com/pages/our-vision), Defendant's mission—which it promotes and performs using the name CARBONCOUNT—is the same and/or closely related to Hannon's mission for, and use of, Hannon's senior CARBONCOUNT Mark: to restore the environment and climate by providing tools that measure and quantify the reduction of carbon emissions.

55.     Similar to Hannon, Defendant achieves those goals by promoting and increasing attention of carbon reduction efforts using the brand CARBONCOUNT.

56.     Also just like Hannon, Defendant provides goods and services to consumers under a CARBONCOUNT mark that, according to Defendant, allows Defendant's customers to "simplify, streamline and fast–track soil carbon projects that meet regulatory requirements through a suite of innovative tools geared towards maximising profits." *See* https://www.carboncount.com/pages/our-vision. Specifically, among Defendant's goods and services offered in connection with Defendant's CARBONCOUNT mark are software tools for collaborating, managing, and executing carbon projects as well as tracking, measuring, and calibrating carbon removal, managing farm productivity, and administering the sequestration of soil carbon from the atmosphere; a soil carbon management platform for streamlining the process of running social carbon projects; consulting services relating to geological sequestration of carbon dioxide; measuring and verifying carbon dioxide and other greenhouse admission offsets; and researching and developing technology in the field of carbon dioxide sequestration (collectively and with other goods and services offered by Defendant, "Defendant's Goods and Services").

57.     As noted above, by the time Defendant first launched its CARBONCOUNT brand in Australia in 2019, Hannon had already built substantial recognition of, and value in, its CARBONCOUNT Mark here in the United States.

58.     Hannon therefore unquestionably has priority over Defendant in connection with CARBONCOUNT (and variations thereof) in the United States.

**E.     Defendant's Activities in and Directed to the United States**

59.     After operating exclusively in Australia for a period of time, Defendant systematically began taking steps to promote and advertise its CARBON COUNT-named business and promote, sell, offer to sell, and advertise Defendant's Good and Services in connection with a CARBONCOUNT mark in the United States in violation of Hannon's senior rights.

60.     For example, upon information and belief as part of its early efforts to expand into the United States, Defendant registered the Domain <carboncount.com> in August 2020, specifically selecting the gTLD <.com> (which is most prominently associated with the United States) in lieu of the ccTLD <.au> for Australia.

61.     On or around September 6, 2021, Defendant published a tweet inviting the public to join a September 21 webinar in which Defendant's "US plans" would be announced. A true and correct copy of the tweet is below and attached as **Exhibit 14**.



Carbon Count
@carbon_count

···

Join Our Webinar on Sept 21st for a deep–dive into #CarbonCount and get a #sneakpeek of our US plans! —> 10AM AEST / 5PM San Fran (GMT-7) / 8PM New York (GMT-4). Join the conversation! bit.ly/Discover_Carbo…

6:47 PM · Sep 6, 2021 · Twitter Web App

62.     The link contained in this tweet redirects to a LinkedIn advertisement for the webinar that states, among other things, that Defendant is "currently in Australia, and soon in North America (sneak peek into what's coming for the USA included)." A true and correct copy of this LinkedIn advertisement is attached as **Exhibit 15**.

63.     On information and belief, during the September 21, 2021 webinar, Sing Le announced that Defendant's Goods and Services sold, promoted, advertised, and offered for sale in connection with a CARBONCOUNT mark in the United States were "now available in the U.S."

64.     Later in the webinar, Justin Baird was introduced as the "U.S. entity of business" for Defendant, who discussed Defendant's plans to work with VERRA and other U.S.-based organizations and to promote Defendant's Goods and Services in connection with a CARBONCOUNT mark to US-based consumers.

65.     In a company update published on February 11, 2022, Defendant confirmed that it had "initiated trials using [its CARBONCOUNT-branded] platform for soil carbon sequestrations in Ireland and are soon launching further trials in the USA and Canada." A true and correct copy of this company update is attached as **Exhibit 16**.

66.     On March 17, 2022, Defendant published a tweet announcing the company's February 2022 monthly company update, including the "launch of V2, Series B funding round opening March 28, our US tour and more." A true and correct copy of the tweet is below and attached as **Exhibit 17**.



67.     Defendant's February 2022 monthly company update, attached as **Exhibit 18**, states that "[o]ur US tour is also in full swing with stimulating conversations being had with our users, potential partners and investors."

68.     Defendant's Series B funding round was further advertised in an April 12, 2022, article published by The Fifth Estate, stating that Defendant has "received interest from farmers in a number of overseas markets, including the US." A true and correct copy of the article is attached as **Exhibit 19**.

69.     Upon information and belief, Defendant currently offers, sells, promotes, and advertises Defendant's Goods and Services to consumers in the United States in connection with the CARBONCOUNT Mark.

70.     In fact, on March 3, 2022, Defendant filed an application to register a CARBONCOUNT-formative mark—specifically the CARBON COUNT MEASUREMENT AND CERTIFICATION design mark (pictured below), with the USPTO in connection with "Software as a service (SAAS) featuring software for collaborating, managing, and executing carbon projects, tracking, measuring and calibrating carbon removal, managing farm productivity, and administrating the sequestration of soil carbon from the atmosphere, all of the foregoing to enable the restoration of landscape, climate and community; soil carbon project management platform for streamlining the process of running a soil carbon project; Consulting services pertaining to the technology of geological sequestration of carbon dioxide; Measurement and verification of carbon dioxide and other greenhouse gas emission offsets; Research and development of technology in the field of carbon dioxide sequestration" (together with Defendant's other uses of CARBONCOUNT and CARBON COUNT, the "Infringing Marks"):



71.     Defendant submitted this application under Trademark Act Section 1(a), claiming that Defendant is currently using the mark in commerce in the United States, and that Defendant's first use of the mark in commerce in the United States was August 16, 2021. A true and correct copy of the USPTO TESS/TSDR information for the CARBONCOUNT MEASUREMENT AND CERTIFICATION mark is attached as **Exhibit 20**.

**F.      Defendant's Intentional and Willful Violation of Hannon's Rights**

72.     As stated briefly above, Defendant began using its Infringing Marks—which are identical and/or virtually identical to Hannon's senior CARBONCOUNT Mark—after Hannon's CARBONCOUNT Mark had acquired secondary meaning in the United States.

73.     Upon information and belief, Defendant had actual knowledge of Hannon's rights in the senior CARBONCOUNT Mark before Defendant began using the Infringing Marks in the United States, but Defendant nevertheless decided to expand into the United States in violation of Hannon's rights.

74.     Moreover, Defendant has also demonstrated an unwillingness to cease its infringing activities, and in fact actually expanded its infringing conduct in response to Hannon's efforts to protect its brand.

75.     For example, upon learning of Defendant's infringement, Hannon sent a cease and desist letter to Defendant on January 3, 2022, asking Defendant to cease use of the Infringing Marks in the United States, raising concerns that Defendant's use of those marks created a substantial likelihood of confusion and therefore constituted, at a minimum, infringement, unfair competition, and false association. A true and correct copy of Hannon's January 3, 2022 cease and desist letter to Defendant Carbon Count Pty Ltd. is attached as **Exhibit 21**.

76.     Defendant responded by letter to Hannon on January 21, 2022. In its response, Defendant refused to cease its use of the Infringing Marks.

77.     In hopes of reaching an amicable resolution, Hannon sent another letter on February 8, 2022.

78.     Defendant again refused to cease use of the Infringing Marks, further demonstrating Defendant's intentional and reckless disregard for Hannon's hard-earned and well-established senior rights in the CARBONCOUNT Marks.

## CAUSES OF ACTION

### COUNT I
### Trademark Infringement
### (15 U.S.C. § 1114)

79.     Hannon incorporates the preceding paragraphs of the Complaint by reference as if fully set forth here.

80.     Hannon owns the CARBONCOUNT Mark.

81.     The CARBONCOUNT Mark has become associated in the minds of consumers with Hannon's goods and services by virtue of, among other things, Hannon's consistent and substantial commercial use of the CARBONCOUNT Mark. As such, the CARBONCOUNT Mark acquired secondary meaning before Defendant began using the Infringing Marks in the United States.

82.     Defendant uses the Infringing Marks, which include reproductions, counterfeits, copies, or colorable imitations of Hannon's registered CARBONCOUNT Mark, in advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods and services, including but not limited to Defendant's Goods and Services, which are not sponsored by or affiliated with Hannon.

83.     Defendant's actions, including without limitation by selling goods and services that are identical and/or closely related to those that Hannon sells and promotes using its senior CARBONCOUNT Mark, are likely to cause confusion, mistake, or deception as to the source of the origin of goods offered by Defendants in connection with the Infringing Marks, in that customers and potential customers are likely to believe that those goods offered by Defendant in connection with a reproduction, counterfeit, copy, or colorable imitation of Hannon's registered CARBONCOUNT Mark are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Hannon.

84.     Defendant's actions are likely to cause confusion, mistake, or deception, in that customers and potential customers are likely to believe there is a sponsorship, approval, licensing, affiliation, association, or some legitimate connection between the goods and services provided by Defendant in connection with the Infringing Marks and Hannon, when there is no such relationship.

85.     Upon information and belief, Defendant's actions have already caused actual confusion, mistake, or deception as to the affiliation, connection, or sponsorship of Defendant's Goods and Services among the consuming public.

86.     The likely confusion, mistake, or deception caused by Defendant is willful and is in violation of section 32 of the Lanham Act, 15 U.S.C. §1114.

87.     As a direct and proximate result of the likely confusion, mistake, or deception, Hannon has suffered and will continue to suffer irreparable harm unless Defendant's conduct is enjoined.

## <u>COUNT II</u>
### Federal Unfair Competition and False Designation of Origin
### (15 U.S.C. § 1125(a))

88.     Hannon incorporates the preceding paragraphs of the Complaint by reference as if fully set forth here.

89.     Defendant's actions constitute use of terms, names, symbols, and devices, and use of false designations of origin, all of which are likely to cause confusion, mistake, or deception as to the source of origin of the goods and services provided by Defendant, in that customers and potential customers are likely to believe that such goods are provided by, sponsored by, approved by, licensed by, affiliated or associated with, or in some other way legitimately connected to Hannon.

90. Defendant's actions are likely to cause confusion, mistake, or deception, in that customers and potential customers are likely to believe there is sponsorship, approval, licensing, affiliation, association, or some legitimate connection between the goods and services provided by Defendants in connection with the Infringing Marks and Hannon, when there is no such relationship.

91. Upon information and belief, Defendant's actions have already caused actual confusion, mistake, or deception as to the affiliation, connection, or sponsorship of Defendant's Goods and Services among the consuming public.

92. Upon information and belief, Defendants have engaged in this conduct for the purpose of misleading consumers into believing that Defendants' products are sponsored by, affiliated with, or otherwise connected to Hannon and/or its CARBONCOUNT Mark.

93. The likely confusion, mistake, or deception caused by Defendant's actions is willful and is in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

94. As a direct and proximate result of the likely confusion, mistake, or deception, Hannon has suffered and will continue to suffer irreparable harm until Defendant's conduct is enjoined.

### COUNT III
**Common Law Unfair Competition and False Designation of Origin**

95. Hannon incorporates the preceding paragraphs of the Complaint by reference as if fully set forth here.

96. Hannon's CARBONCOUNT Mark is a distinctive mark that is eligible for protection under Maryland common law.

97.     Hannon has used the CARBONCOUNT Mark, and that mark acquired secondary meaning, in Maryland long before Defendant began using the Infringing Marks in commerce in Maryland.

98.     Defendant's use of the Infringing Marks has caused, and is likely to continue to cause, confusion with Hannon's CARBONCOUNT Mark and constitutes unfair competition and false designation of origin in violation of Hannon's rights.

99.     Defendant's conduct has been and continues to be willful and deliberate, and Defendant has profited and been unjustly enriched by sales that Defendant would not otherwise have made if not for its unlawful conduct.

100.    Defendant's actions have caused injury and damages to Hannon, including irreparable injury to Hannon's goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby Hannon has no adequate remedy at law.

## JURY DEMAND

Plaintiff Hannon Armstrong Sustainable Infrastructure Capital, Inc. demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff Hannon Armstrong respectfully requests the following relief:

a.      a preliminary and permanent injunction restraining Defendant Carbon Count Pty Ltd., along with its directors, members, officers, agents, servants, parents, subsidiaries, affiliates, employees, attorneys, and all persons in active concert or participation with, through, or under any of them, at first during the pendency of this action and thereafter perpetually from:

    i.      committing any acts of trademark infringement, unfair competition, and from implying a false designation of origin or a false description or representation with respect to Hannon's CARBONCOUNT Mark;

    ii.     from using in any manner packaging, labels, signs, literature, display cards, Internet website, or other packaging, advertising, or promotion materials, o other materials, the Infringing Marks and any other marks, words, names, hashtags, domain names, or social media accounts, that are confusingly similar to the CARBONCOUNT Mark; and

    iii.    registering, attempting to register, or maintaining an application or registration with the USPTO for the Infringing Marks or any other mark that is confusingly similar to the CARBONCOUNT Mark, including but not limited to U.S. Appl. Ser. No. 97/293,148;

b.    an Order requiring Defendant to deliver up to Hannon any and all containers, signs, packaging, materials, printing plates, and advertising or promotional materials and any materials used in the preparation thereof, which in any way unlawfully use or make reference to the Infringing Marks;

c.    an Order requiring that Defendant, within thirty (30) days after service of a notice of entry of judgment or issuance of an injunction pursuant thereto, file with the Court and serve upon Hannon's counsel a written report under oath setting forth details of the manner in which Defendant has complied with the Court's order pursuant to Paragraphs (a) and (b) above;

d.    transferring all CARBONCOUNT-formative domain names to Hannon, including but not limited to carboncount.com;

e.    an Order to the USPTO for the refusal of any application by Defendant that seeks to register CARBONCOUNT or CARBON COUNT, alone or with other elements, including but not limited to U.S. Appl. Ser. No. 97/293,148;

f.    an Order requiring Defendant to pay over all of Hannon's damages sustained by Hannon a s a result of Defendant's willful infringement and unfair competition, and pay to Hannon an accounting of Defendant's profits, and ordering that the amount of damages awarded to Hannon be increased three times the amount thereof pursuant to 15 U.S.C. §§ 1117(b) and 1125;

g.    an award of Plaintiff's reasonable attorneys' fees and costs of this action under all applicable laws, including but not limited to 15 U.S.C. § 1117 and 28 U.S.C. § 1920;

h.    an award of pre- and post-judgment interest as allowed by law; and

i.    such other and further relief to which Plaintiff may be entitled.

Dated: November 2, 2022

Respectfully submitted,

**McGUIREWOODS LLP**

 */s/ Adam T. Simons*
Adam T. Simons (Fed. Bar No. 12355)
500 East Pratt Street
Baltimore, MD 21202
Tel: (410) 659-4417
Fax: (410) 659-4484
asimons@mcguirewoods.com

Lucy Jewett Wheatley (*pro hac forthcoming*)
Amanda L. DeFord (*pro hac forthcoming*)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061
lwheatley@mcguirewoods.com
adeford@mcguirewoods.com

Matthew W. Cornelia (*pro hac forthcoming*)
Daniel P. Withers (*pro hac forthcoming*)
2000 McKinney Avenue, Suite 1400
Dallas, TX 75201
Tel: (214) 932-6400
Fax: (214) 932-6499
mcornelia@mcguirewoods.com
dwithers@mcguirewoods.com

*Counsel for Plaintiff Hannon Armstrong*
*Sustainable Infrastructure Capital, Inc.*